# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **NANCY S.,** | § | |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **V.** | § | **CIVIL CASE NO. 3:22-CV-429-D-BK** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **DEFENDANT.** | § | |

## FINDINGS, RECOMMENDATIONS, AND CONCLUSIONS
### OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. § 636(b) and *Special Order 3*, the parties' cross-motions for summary judgment are before the Court. For the reasons that follow, *Plaintiff's Motion for Summary Judgment*, Doc. 11, should be **DENIED**, *Defendant's Motion for Summary Judgment*, Doc. 12, should be **GRANTED**, and the decision of the Commissioner should be **AFFIRMED**.

## I. BACKGROUND

### A. *Procedural History*

Plaintiff seeks judicial review of the Commissioner's final decision denying in part her application for disability insurance benefits under Title II of the Social Security Act ("the Act"). Plaintiff filed her application in October 2019, alleging disability beginning in June 2017, due to Parkinson's disease, sleep apnea, anxiety, depression, arthritis, lower back pain, hypothyroidism, high cholesterol, chronic obstructive pulmonary disease, and anemia. Doc. 8-1 at 185-186, 207, 211. Ultimately, the ALJ issued a partially favorable decision finding that Plaintiff was not disabled prior to November 14, 2019, but became disabled on, and continued to be disabled after,

that date.  Doc. 8-1 at 29.  The Appeals Council denied Plaintiff's request for review, Doc. 8-1 at 5-10, and she now appeals to this Court pursuant to 42 U.S.C. § 405(g).

### B.  Factual Background

Plaintiff was 61 years old at the time of her alleged disability onset date.  Doc. 8-1 at 185. Plaintiff has two years of college education.  Doc. 8-1 at 212.  She has past work experience as a bookkeeper and recruiter.  Doc. 8-1 at 26, 74.

Plaintiff testified at the administrative hearing held February 19, 2021, that she last worked as a recruiter for Coca Cola until her contract ended sometime in 2017.  Doc. 8-1 at 45. Before that, Plaintiff worked as a bookkeeper" in a corporate accounting department until she began "having some symptoms that were affecting [her] ability to remember."  Doc. 8-1 at 46. Plaintiff also testified that she had problems sleeping and waking up, Doc. 8-1 at 46, decreased strength, and hand tremors that impacted her ability to write legibly, Doc. 8-1 at 50.

Plaintiff also testified that she was diagnosed with Parkinson's disease in 2008, her tremors had worsened over the last four years, and while medication lessened the frequency of the tremors, it "never completely" stopped them.  Doc. 8-1 at 50-52.  Although Plaintiff was no longer able to cross stitch or vacuum, she could still drive and do some household chores like pay bills using a computer and wash light loads of laundry.  Doc. 8-1 at 52-54.  On cross examination, Plaintiff testified that due to the Parkinson's, she had memory and speech problems and difficulty walking more than 20 minutes, and significant joint pain that interfered with activities of daily living.  Doc. 8-1 at 66.

At the time of her alleged onset date, Plaintiff was receiving ongoing medical care from a pain specialist, Dr. Kelly Will, for her lumbar and cervical spondylosis and lumbar radiculopathy, including taking prescription medications and receiving trigger point injections,

2

epidural steroid injections, and facet injections. Doc. 8-1 at 551-576; Doc. 8-2 at 827-839. Before seeing Dr. Will, from mid-2015 to late-2019, Plaintiff had received medical management of her osteoarthritis—mainly chronic joint-pain and stiffness—from Dr. Sharad Lakhanpal of Rheumatology Associates. Doc. 8-1 at 577-703. Plaintiff also received medical care from Dr. William Bruck, an orthopedic surgeon, who prescribed epidural and facet injections, medications, and physical therapy for her back pain. Doc. 8-1 at 856-870, 876-877, 883, 889-902, 916-917, 926, 929-930. On November 14, 2019, after Plaintiff reported worsening symptoms, on Dr. Bruck performed back surgery, to-wit: a L4-5 laminectomy, left facetectomy, and L4-5 transforaminal lumbar interbody fusion and lateral fusion. Doc. 8-2 at 2-557, 711-715.

In addition, Plaintiff was seen by a neurologist, Dr. Ziad Blaik, who prescribed her various medications to help alleviate the effects of Parkinson's disease which included hand tremors and episodic freezing.[1] Doc. 8-1 at 712, 717, 725, 722-723, 737-741; Doc. 8-2 at 842-858, 861-864. In June 2017, Dr. Blaik noted Plaintiff's long-standing history of Parkinson's disease and that, on examination, she had choreiform movements[2] in her hands, so he refilled her prescription for Carbidopa-Levodopa. Doc. 8-1 at 740-741. At her November 2017 appointment, Dr. Blaik noted that Plaintiff required additional Sinemet to control her tremors and started her on Trihexyphenidyl. Doc. 8-1 at 737. On her next several visits to Dr. Blaik in

---

[1] Parkinson's disease or parkinsonism is a "neurologic syndrome usually resulting from deficiency of the neurotransmitter dopamine as the consequence of degenerative, vascular, or inflammatory changes in the basal ganglia; characterized by rhythmic muscular tremors, rigidity of movement, festination, droopy posture, and masklike facies." Stedmans Medical Dictionary 654270 (accessible on Westlaw).

[2] Choreiform or choreoid (chorea) movements are involuntary jerky or twitchy movements, characteristic of Parkinson's Disease. See Stedmans Medical Dictionary 172820, 172870, 462680 (accessible on Westlaw).

December 2017 and in 2018, Plaintiff reported doing well on her medications, and Dr. Blaik noted she was functional as long as she was on drug therapy.  Doc. 8-1 at 731, 734, 737.

At her June 2018 appointment, Plaintiff reported experiencing sleeplessness and indicated she had insomnia due to her medications.  Doc. 8-1 at 731-732.  In January 2019, Plaintiff reported that she could not keep her foot still, and Dr. Blaik prescribed her a new medication for restless leg syndrome.  Doc. 8-1 at 722-723.  At her August 2019 appointment, Plaintiff reported "freezing spells," and in November 2019, Dr. Blaik prescribed Apokyn solution injections to treat the spells.  Doc. 8-1 at 710, 712.  At her March 2020 visit, Dr. Blaik noted she was having "on/off phenomenon as well as freezing episodes," and he continued her on her prescriptions.  Doc. 8-2 at 855-856.

In February 2021, Dr. Blaik responded to written "Interrogatories" regarding Plaintiff's functional abilities.  Doc. 8-2 at 882-884.  His answers, largely indicated by marking "yes" or "no" to narrative inquiries, are at the crux of Plaintiff's arguments here.  Dr. Blaik affirmed that, based on his treatment and clinical examinations and his review of his own treatment records and those of other professional available to him, Plaintiff demonstrated episodic tremors of her right hand that precluded her from effectively using the hand, as well as cognitive difficulties, significant fatigue, speech changes, and impaired balance.  Doc. 8-2 at 882.  Dr. Blaik also opined that Plaintiff could reasonably be expected to be off task at least 15 percent of the time while trying to perform work activities on a sustained basis.  Doc. 8-2 at 883.  He likewise answered "yes" to the query, "[a]re the opinions about based on your own clinical observations, even if every specific finding has not been recorded in the actual treatment notes?"  And finally, in the space marked "COMMENTS" at the end of the questions, Dr. Blaik wrote, "[t]his patient is totally disabled from Parkinson's disease."  Doc. 8-2 at 884.

4

### C.  The ALJ's Findings

As significant here, the ALJ found that, from Plaintiff's alleged onset date of June 2017

through the date of his decision, Plaintiff had the severe impairments of "lumbar spine

degenerative disc disease, Parkinson's disease, [and] left hip degenerative joint disease, and the

"nonsevere" impairments of "sleep apnea, depression, and anxiety," but did not have an

impairment or combination of impairments that met or medically equaled a listing for

presumptive disability under the Code of Federal Regulations.  Doc. 8-1 at 20, 22.  Next, the ALJ

found that, prior to November 14, 2019, Plaintiff retained the residual functional capacity

("RFC") to perform a limited range of light work with some postural limitations, which, he

concluded was fully supported by the "medical evidence submitted from June 30, 2017 until

November 14, 2019."  Doc. 8-1 at 22-23.  The ALJ expounded:

> While September 2017 lumbar spine MRI scan identified moderate facet
> degenerative changes at the L5-S1 level and severe facet degenerative changes at
> the L4-5 level with marked articular diastasis, [Plaintiff] did not require intensive
> treatments until her November 2019 lumbar spine surgery (Exhibit 2F, pgs. 176-
> 177, Ex, 7F, pg. 11).  During a series of medical visits prior to the established onset
> date, she did not consistently exhibit or describe severe spine pain or a greatly
> reduced range of motion (Exhibit 2F, pgs. 39, 47, 55, 68, 71).  She was prescribed
> trigger point injections for a bout of left leg and left buttocks pain, but the follow-
> up visits describe improved pain control (Exhibit 2F, pgs. 20, 26-32).
>
> The treatment notes submitted by her pain specialists also describes mostly normal
> physical abilities and intact neurological senses prior to November 2019 (Exhibit
> 3F, pgs. 4-8).  In May 2018, it was noted that her pain control was "much better"
> after she was prescribed steroid injections (Exhibit 3F, pg. 5).  It was reported that
> she walked normally during the evaluation, further suggesting her condition was
> not as debilitating as described (Exhibit 3F, pg. 5). In July 2018, she exhibited intact
> neurological senses and she walked normally, despite her description of neck pain
> (Exhibit 3F, pg. 5).  She was provided with cervical spine trigger point injections
> (Exhibit 3F, pg. 5-6).  She returned to pain therapy services in November 2018 after
> a lengthy gap in treatment, further suggesting her injections improved her pain
> control (Exhibit 3F, pg. 6).  In July 2019, she reported that she was doing well and
> her current medication program improved her physical and psychosocial

functioning (Exhibit 3F, pg. 18). She denied medication side effects (Exhibit 3F, pg. 18).

The claimant also received on-going medical care from her treating rheumatologists (Exhibit 4F). The visits mainly discussed her medication program, which improved her generalized osteoarthritis pain (Exhibit 4F). For example, in September 2018, she reported that she was "doing well" despite periods of morning joint stiffness (Exhibit 4F, pgs. 26-28). Similarly, in December 2018, she reiterated that she was "doing well" and that she was able to perform stretching exercises at home (Exhibit 4F, pg. 21). In March 2019, the claimant described on-going morning stiffness and that she has "some" difficulty with certain daily activities, but she reported that she was well and results of the physical examination did not reveal significant limitations (Exhibit 4F, pgs. 16-18). The results of a July 2019 in-office examination did not reveal debilitating pain, the inability to function, or severe muscle weakness, further supporting the above outlined residual functional capacity.

Overall, the claimant's period of disability began in November 2019 after she underwent a lumbar spine L4-5 laminectomy with a transforaminal lumbar interbody fusions (TLIF) surgery at the L4-5 level (Exhibit 7F, pg. 2). . . .

Doc. 8-1 at 23-24.

Relying on the hearing testimony of the vocational expert ("VE") based on hypothetical questions posed, the ALJ found that, prior to November 14, 2019,  Plaintiff was able to return to her past work as a bookkeeper and had transferable work skills that enabled her to also perform other available jobs.  Doc. 8-1 at 26-28, 74-77.  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Act, prior to November 14, 2019.  Doc. 8-1 at 28.

The ALJ next found that, beginning on November 14, 2019, Plaintiff retained the RFC to perform the same range of light work, but she required the flexibility to take a 15-minute break every hour during an eight-hour workday.  Doc. 8-1 at 24.  Based on Plaintiff's RFC and the VE's testimony that an individual requiring a 15-minute break every hour could not perform any competitive work, Doc. 8-1 at 76, the ALJ found that, as of November 14, 2019, Plaintiff could

not perform any past work or other work in the national economy. Doc. 8-1 at 28. Thus, the ALJ found that Plaintiff was disabled under the Act as of November 14, 2019. Doc. 8-1 at 28-29.

## II. APPLICABLE LAW

An individual is disabled under the Act if, *inter alia*, she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or can be expected to last for at least 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner uses the following sequential five-step inquiry to determine whether a claimant is disabled: (1) an individual who is working and engaging in substantial gainful activity is not disabled; (2) an individual who does not have a "severe impairment" is not disabled; (3) an individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors; (4) if an individual is capable of performing her past work, a finding of "not disabled" must be made; and (5) if an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and RFC must be considered to determine if any other work can be performed. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. §§ 404.1520(b)-(f), 416.920(b-(f)).

Under the first four steps of the analysis, the burden of proof lies with the claimant. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* If the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994). This burden may be satisfied either by reference to the Grid Rules, vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan*, 38 F.3d at 236; 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett*, 67 F.3d at 564. Under this standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

In considering the parties' summary judgment arguments, the Court has relied upon their assessment of and citation to the evidence of record. The Court is not under any obligation to probe the record to find supporting evidence for one side or the other. *See* FED. R. CIV. P. 56 (the movant and opponent of a motion for summary judgment must support their positions by "citing to particular parts of materials in the record"); *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006) (the court has no obligation under Rule 56 "to sift through the record in search of evidence to support a party's opposition to summary judgment") (quotation omitted).

## III.    ARGUMENT AND ANALYSIS

Plaintiff challenges the Commissioner's decision on two grounds. First, she argues that the ALJ committed reversible error because he "did not provide the required articulation[] or conduct a proper persuasiveness analysis of Dr. Blaik's medical opinion," as required by 20 C.F.R. § 404.1520c(b)(2). Doc. 11 at 5. Second, she contends that the ALJ's determination that

Plaintiff's disability did not begin until November 14, 2019, is "inconsistent with the nature of [Plaintiff's] impairments and unsupported by substantial evidence." Doc. 11 at 5.

### A. *The ALJ's Evaluation of Dr. Blaik's February 2021 Opinion*

Because Plaintiff filed for benefits "on or after March 27, 2017," the ALJ was required to apply the revised social security regulations for evaluating medical opinions and administrative medical findings. 20 C.F.R. § 404.1520c. To that end, ALJs are no longer required to give controlling weight to treating physicians' opinions. *Webster v. Kijakazi*, 19 F.4th 715, 718-19 (5th Cir. 2021). Instead, the ALJ must consider the persuasiveness of medical opinions from different sources. 20 C.F.R. §§ 404.1520c(a-b).

Five factors bear on persuasiveness: (1) supportability; (2) consistency; (3) the relationship with the claimant; (4) specialization; and (5) other factors that "tend to support or contradict the opinion." *Id.* §§ 404.1520c(c)(1)-(5). The most significant of the factors are supportability and consistency. *See id.* § 404.1520c(a). "While supportability measures the degree of relatedness between a medical provider's opinion and the medical evidence she provides to support that opinion, consistency is an all-encompassing inquiry, which focuses on how well a medical source is supported, or not supported, by the entire record." *Linda M. v. Comm'r, Soc. Sec. Admin.*, No. 3:21-CV-210-BK, 2022 WL 4125095, at *3 (N.D. Tex. Sept. 8, 2022) (cleaned up) (Toliver, J.); *see also Sharon H. v. Kijakazi*, No. 5:21-CV-167-H, 2022 WL 3951488, at *3 (N.D. Tex. Aug. 31, 2022) (Hendrix, J.) ("[S]upportability looks internally to the bases presented by the medical opinion itself" while "consistency is an external inquiry that juxtaposes a medical opinion to other evidence in the record, including opinions of other medical professionals.").

"While the ALJ must explain how [they] considered the supportability and consistency factors for a medical source's medical opinions, there are no magic words or specific amount of explanation required." *Anthony D. v. Comm'r of Soc. Sec. Admin.*, No. 3:19-CV-2900-X-BK, 2021 WL 9315235, at *5 (N.D. Tex. Aug. 25, 2021) (Toliver, J.) (citing 20 C.F.R. § 404.1520c(b)(2)), *adopted by* 2022 WL 2900999 (N.D. Tex. July 22, 2022) (Starr, J.).  At a minimum, the ALJ's explanation of persuasiveness must "enable[ ] the court to undertake a meaningful review of whether his finding with regard to the particular medical opinion was supported by substantial evidence," and must not "require the court to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof." *Braley v. Kijakazi*, No. 3:20-CV-3207-X-BH, 2022 WL 4280918, at *17 (N.D. Tex. Aug. 31, 2022) (Ramirez, J.) (internal punctuation and citation omitted), *adopted by* 2022 WL 4280652 (N.D. Tex. Sept. 15, 2022) (Starr, J.).

Here, the ALJ stated in his written decision that he "considered Medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 C.F.R. [§] 404.1520c." Doc. 8-1 at 22.  With respect to Dr. Blaik, the ALJ noted that in his "brief assessment," Dr. Blaik "did not include a detailed rationale for his vague assessment and [he] did not reference actual medical records to support his report." Doc. 8-1 at 25.  The ALJ also found, however, that Dr. Blaik's "overall determination that [Plaintiff's] impairments have reduced [her] ability to work is somewhat consistent with the medical record." Doc. 8-1 at 25. Specifically, the ALJ pointed to records following Plaintiff's November 14, 2019 back surgery, noting that "post-surgical treatment reports describe on-going physical limitations," the need for hip injections, and fatigue. Doc. 8-1 at 25.  Consequently, the ALJ found "Dr. Blaik's brief assessment to be partially persuasive." Doc. 8-1 at 25.

10

Plaintiff argues that the ALJ did not adequately articulate his analysis of the "consistency" and "supportability" factors as to Dr. Blaik's February 2021 opinion. Doc. 11 at 21-27. She notes that "although the ALJ offered an explanation of how Dr. Blaik's medical opinion was consistent with, and therefore persuasive, for the period beginning November 14, 2019," the ALJ "offered no explanation as to why Dr. Blaik's medical opinion pertaining to Plaintiff's limitations prior to November 14, 2019, was inconsistent with the evidence from other medical and non-medical sources, and therefore unpersuasive." Doc. 11 at 24. Plaintiff further contends that, in addressing "supportability," the ALJ relied solely on a lack of reference by Dr. Blaik in his February 2021 opinion to "actual medical reports," but failed to consider Dr. Blaik's treatment notes that were present in the record. Doc. 11 at 25.

In response, the Commissioner argues that the ALJ sufficiently addressed consistency and points to records the ALJ found supporting Plaintiff's disability beginning November 14, 2019, including medical records pertaining to Plaintiff's lumbar surgery. Doc. 12 at 6. Further, with respect to supportability, the Commissioner asserts that Dr. Blaik's contemporaneous treatment reports do not document the degree of limitations claimed in Dr. Blaik's February 2021 assessment for the time period prior to November 2019. Doc. 12 at 7.

Upon review, the Court finds Plaintiff's argument persuasive, in that the ALJ deviated from the requirements set forth in 20 C.F.R. § 404.1520c. First, with respect to consistency, the ALJ noted generally that Dr. Blaik's "overall determination that [Plaintiff's] impairments have reduced [her] ability to work is somewhat consistent with the medical record." Doc. 8-1 at 25. However, while the ALJ articulated how Dr. Blaik's medical opinion was consistent with the medical evidence, and therefore persuasive, for the period beginning November 14, 2019, by

11

citing to medical records from after that date, the ALJ offered no like analysis regarding Dr.

Blaik's medical opinion of Plaintiff's limitations *prior to November 14, 2019*.

As to supportability, the ALJ found that "Dr. Blaik did not include a detailed rationale for

his vague assessment and [he] did not reference actual medical records to support his report[.]"

Doc. 8-1 at 25.  The Commissioner is correct in this regard.  As previously noted, Dr. Blaik's

February 2021 assessment is in the form of yes/no responses to interrogatories, followed by a

conclusory statement,  and contains minimal explanation.  The Court of Appeals for the Fifth

Circuit has recognized that opinions of treating physicians are not entitled to considerable weight

when they are "brief and conclusory" and "lack 'explanatory notes' or 'supporting objective tests

and examinations.'"  *See Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017) (quoting *Foster

v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011)).  Under the new regulations, district courts in

this circuit have determined that "brief and conclusory opinions unsupported by relevant medical

evidence lack supportability."  *Braley*, 2022 WL 4280918, at *18 (collecting cases regarding

form checkbox and fill-in-the-blank reports as "weak" evidence when lacking explanatory notes

or additional supporting evidence).

In the case *sub judice*, however, the record before the ALJ included more than a brief and

conclusory opinion unsupported by relevant medical evidence.  In addition to his February 2021

assessment, Dr. Blaik's more detailed treatment notes were available for the ALJ's review at

Exhibits 5F and 19F in the record, *see* Doc. 8-1 at 710-742; Doc. 8-2 at 842-859, but the ALJ

does not reference them.  In short, even if the ALJ considered Dr. Blaik's treatment notes, his

written analysis regarding his supportability determination of Dr. Blaik's opinion inadequately

reflects that.  Consequently, the Court is left to speculate why Dr. Blaik's records fail to support

his February 2021 opinion.  *See, e.g.*, *Chavarria v. Kijakazi*, No. EP-22-CV-00407-KC-RFC,

2023 WL 3984857, at *5 (W.D. Tex. June 13, 2023) (deeming insufficient the ALJ's explanation that a doctor's opinion was unsupported, even when the doctor's opinion was a standard form with minimal explanation, because the ALJ failed to consider the doctor's "more detailed treatment notes" that were available in the record), *adopted by* 2023 WL 4237594 (W.D. Tex. June 28, 2023); *cf. Hubbard v. Comm'r of Soc. Sec.*, No. 4:20-CV-00588-BP, 2022 WL 196297, at *4 (N.D. Tex. Jan. 21, 2022) (finding sufficient the ALJ's explanation that a doctor's opinion was unsupported because the doctor's opinion was "in questionnaire format" without elaborative explanations and the doctor's treatment notes were "*not in the file*" for the ALJ's review) (emphasis added).

However, the foregoing notwithstanding, Plaintiff cannot establish that she was prejudiced.

### B. Prejudice

Procedural perfection in administrative proceedings is not required, and the Court will not vacate a decision "unless the substantial rights of a party have been affected." *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988). Procedural errors affect the substantial rights of a claimant only when they "cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988). "Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached even if the ALJ did not err." *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021). The plaintiff bears the burden of showing that the ALJ's error was prejudicial. *Jones v. Astrue*, 691 F.3d 730, 734 (5th Cir. 2012).

Instructive to the issues presented in the case *sub judice* is the Fifth Circuit's decision in *Miller v. Kijakazi*, which addressed harmless error in the context of an ALJ's failure to "explain

13

how she considered the supportability and consistency factors as required by § 404.1520c(b)(2)."

2023 WL 234773, at *3 (5th Cir. Jan. 18, 2023) (per curiam) (cleaned up).  As explained in

*Miller*:

> Miller misunderstands her burden here. The ALJ's error was that she did not
> provide sufficient explanation of her consideration of the medical opinions.  As set
> forth above, her decision makes clear that she considered them.  She acknowledged
> that the opinions contained more limiting restrictions, but she did not find them
> persuasive.  Miller fails to show that if the ALJ had given further explanation, then
> she would have adopted them.  Miller is essentially asking us to reweigh the
> evidence to show that she was prejudiced by the ALJ's failure to explain, which we
> cannot do.  *See Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).  In sum,
> Miller fails to show how the ALJ's error was harmful.

*Miller*, 2023 WL 234773, at *4 (emphasis added).

The Fifth Circuit's analysis in *Miller* is applicable here.  The ALJ's error was that he did

not provide sufficient explanation of his consideration of Dr. Blaik's February 2021 opinion.  As

in *Miller*, the ALJ's decision makes clear that he considered Dr. Blaik's opinion—that Plaintiff's

impairments have reduced her ability to work—and found it only "partially persuasive."  *See*

Doc. 8-1 at 25.

Plaintiff contends that "it is not inconceivable that if the ALJ had conducted a proper

evaluation of Dr. Blaik's medical opinion that a different administrative decision may have been

reached."  Doc. 11 at 28.  She argues that the VE's testimony, consistent with Dr. Blaik's

opinion, is that "an individual would be off task at least 15 percent of a workday, [thus,] would

not be able to maintain competitive employment."  Doc. 11 at 29.  The evidence does not support

Plaintiff's conclusion.

The record is clear, aside from his answers to a checkbox questionnaire, Dr. Blaik

provides no supporting explanation for his opinions and no objective medical evidence

supporting his February 2021 opinion.  *See* Doc. 8-2 at 882-884.  With respect to supportability,

14

as the Commissioner correctly notes—and contrary to Plaintiff's argument (*see* Doc. 11 at 25)—
Dr. Blaik's treatment notes, previously summarized by the Court, "do not support the degree of
limitation reported by Dr. Blaik in his February 2021 opinion."  Doc. 12 at 7-8.  Although
Plaintiff reported hand tremors, Dr. Blaik's treatment records reflect that her condition was
stable with medication.  Doc. 8-1 at 713-714, 731, 734, 737.  Insofar as Plaintiff experienced
cognitive issues, slurred speech, impaired balance, and physical dysfunction to the degree
asserted by Dr. Blaik (*see* Doc. 8-2 at 882-884), these symptoms are not documented in his
treatment records before November 2019.  *See* Doc. 7-1 at 710-742.  And, with respect to
consistency, Plaintiff fails to point to evidence from other sources consistent with the level of
impairment asserted in Dr. Blaik's February 2021 opinion—at least as it pertains to Plaintiff's
Parkinson's disease.

      In sum, the ALJ's error is procedural, in that he did not adequately explain his partial
rejection of Dr. Blaik's opinion.  Nonetheless, the medical evidence substantially supports the
ALJ's finding.  Moreover, Plaintiff has not met her burden of showing that, had the ALJ
provided a sufficient explanation of the supportability and consistency factors when discussing
Dr. Blaik's February 2021 opinion, he would have "adopted" more limiting restrictions for the
time period prior to November 14, 2019, *see Miller*, 2023 WL 234773, at *4, or "that a different
administrative conclusion would have been reached even if the ALJ did not err."  *Keel*, 986 F.3d
at 556.  Because the ALJ's error is harmless, and remand is not warranted on this point.

### C.  *Plaintiff's Established Onset Date*

      Plaintiff next challenges the ALJ's assessment of the onset date of disability as
November 14, 2019.  *See* Doc. 11 at 5, 29-34; Doc. 13 at 8-9.  She argues that "the ALJ's onset
date determination is not consistent with the nature of Plaintiff's lumbar spine condition and is

not supported by substantial evidence." Doc. 8-1 at 29.  Among other things, Plaintiff contends

that substantial evidence does not support the ALJ's onset date determination because he did not

consider the treatment records of her orthopedic surgeon, Dr. Bruck.  *Id.*  In response, the

Commissioner contends that the ALJ properly assessed Plaintiff's disability onset date and that

Plaintiff's "effort[] to re-argue the evidence is contrary to the scope of review under § 405(g),

and she fails to address the ALJ's determinative findings."  Doc. 12-1 at 8-9.  The Court agrees.

### 1.  SSR 18-01p

Factors to consider when determining the established onset date (EOD) are found in

Social Security Ruling ("SSR") 18-01p, "Titles II and XVI: Determining the Established Onset

Date (EOD) in Disability Claims." 2018 WL 4945639 (Oct. 2, 2018).[3]  For non-traumatic or

exacerbating and remitting impairment, such as in the case *sub judice*, SSR 18-01p provides the

following guidance:

> We consider whether we can find that the claimant first met the statutory definition
> of disability at the earliest date within the period under consideration, taking into
> account the date the claimant alleged that his or her disability began. We review the
> relevant evidence and consider, for example, the nature of the claimant's
> impairment; the severity of the signs, symptoms, and laboratory findings; the
> longitudinal history and treatment course (or lack thereof); the length of the
> impairment's exacerbations and remissions, if applicable; and any statement by the
> claimant about new or worsening signs, symptoms, and laboratory findings.

*Id.* at *6.

---

[3] SSR 18-01p was promulgated on October 2, 2018, reinterpreting how the EOD should be
determined for claims "involv[ing] traumatic, non-traumatic, and exacerbating and remitting
impairments," replacing and rescinding longstanding SSR 83-20, "Titles II and XVI: Onset of
Disability."  As such, there is a dearth of case law interpreting SSR 18-01p.

### 2. *Requisite Analysis*

Here, the ALJ determined that between June 30, 2017 (Plaintiff's alleged onset date), and November 13, 2019 (the day before her spinal surgery), Plaintiff retained the RFC to perform light work with postural limitations. Doc. 8-1 at 22. He relied on "medical evidence submitted from June 30, 2017[,] until November 14, 2019," which he contends "fully support[s]" this RFC. Doc. 8-1 at 23. He began his analysis by considering Plaintiff's various diagnoses, including lumbar spine degenerative disc disease, Parkinson's disease, and left hip degenerative joint disease. Doc. 8-1 at 20. Next, he found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully supported prior to the established onset date[.]" Doc. 8-1 at 23. Among other evidence, the ALJ considered Plaintiff's hearing testimony that "she stopped working in 2017 after her contract as a professional recruiter ended, not because of her physical impairments." Doc. 8-1 at 23.

Next, the ALJ considered the results of a lumbar spine MRI ordered by Dr. Bruck in September 2017, which "identified moderate facet degenerative changes at the L5-S1 level and severe facet degenerative changes at the L4-5 level with marked articular diastasis[,]" but noted Plaintiff "did not require intensive treatments until after her November 2019 lumbar spine surgery [with Dr. Bruck]." Doc. 8-1 at 23 (citing *id.* at 499-500 and Doc. 8-2 at 11). The ALJ further discussed that at a series of medical visits prior to November 2019, Plaintiff "did not consistently exhibit or describe severe spine pain or greatly reduced range of motion." Doc. 8-1 at 23 (citing *id.* at 362, 370, 378, 391, 394). The ALJ pointed out that treatment notes from Plaintiff's pain specialist "describe[ ] mostly normal physical abilities and intact neurological senses prior to November 2019," and that in "July 2019, she reported that she was doing well

17

and her current medication program improved her physical and psychosocial functioning." Doc.
8-1 at 23 (citing *id.* at 552-556, 566). In addition, he noted that Plaintiff reported to her treating
rheumatologist in September 2018 and December 2018 that she was "doing well" despite periods
of morning stiffness. Doc. 8-1 at 24 (citing *id.* at 597, 602-604). The ALJ discussed that in
March 2019, Plaintiff reported ongoing morning stiffness and "some" difficulty with morning
activities but also that she was well, and the results of a physical exam did not reveal significant
limitations. Doc. 8-1 at 24 (citing *id.* at 592-594). In addition, the ALJ found significant that the
results of a July 2019 in-office examination "did not reveal debilitating pain, the inability to
function, or severe muscle weakness." Doc. 8-1 at 24.

    The ALJ also relied on the vocational assessments of state agency medical consultants
and their prior administrative findings—which he found persuasive for the time period prior to
November 14, 2019—that Plaintiff "was capable of performing the exertional demands of light
work." Doc. 8-1 at 25 (citing *id.* at 90-101, 102-114).

    The ALJ then determined that beginning November 14, 2019, through the date of his
decision, Plaintiff had the RFC to perform light work with the same postural limitations, but she
"require[ed] the flexibility to take an extra fifteen (15) minute break every hour during an eight
(8) hour workday." Doc. 8-1 at 24. In reaching this conclusion, he expressly found that
beginning November 14, 2019, Plaintiff's allegations regarding her symptoms and limitations, as
well as her statements concerning the intensity, persistence and limiting effects of these
symptoms, were consistent with the medical evidence and other evidence. Doc. 8-1 at 24. He
based his finding on the fact that in November 2019, Plaintiff underwent a "lumbar spine L4-5
laminectomy with a transforaminal lumbar interbody fusions (TLIF) surgery at the L4-5 level."

Doc. 8-1 at 24 (citing Doc. 8-2 at 2).  He noted that while she was recovering from this surgery, Plaintiff "was diagnosed with cecal volvulus and required an emergency colon surgery in January 2020.  More specifically, she underwent an open right hemicolectomy with ileocolic staples."  Doc. 8-1 at 24 (citing Doc. 8-2 at 731).  He also considered that the "post-surgical treatment notes clearly show increased fatigue beginning in January 2020, due to her overlapping physical impairments, strongly supporting the determination that she requires extra rest breaks throughout a workday."  Doc. 8-1 at 24 (citing Doc. 8-2 at 731-742, 753-793).

On this record, the Court concludes that the ALJ did not err when determining the onset date of Plaintiff's disability.  SSR 18-01p obligated the ALJ to determine the date that the claimant first met the statutory definition of disability.  This determination had to be supported by the evidence and be consistent with the nature of Plaintiff's impairments. The ALJ accounted for the date Plaintiff alleged her disability began.  While the medical evidence showed that plaintiff suffered from several impairments during the application period, the Court finds that substantial evidence supports the ALJ's conclusion that the nature of Plaintiff's impairments did not become sufficiently severe as to prevent her from working until November 14, 2019, when she underwent a lumbar spine L4-5 laminectomy with a transforaminal lumbar interbody fusions (TLIF) surgery at the L4-5 level.  The result of this surgery in November 2019, as well as the emergency colon surgery in January 2020, and post-operative treatment notes referenced by the ALJ, provide substantial evidence for his conclusion that, as of November 14, 2019, Plaintiff's increased fatigue required her to have extra rest breaks throughout the day.

For the reasons discussed at length *supra*, the Court rejects Plaintiff's contention the ALJ's finding regarding the disability onset date is not supported by substantial evidence because he did not consider Dr. Bruck's records.  As noted above, the ALJ considered the results

of a lumbar spine MRI ordered by Dr. Bruck in September 2017, which "identified moderate facet degenerative changes at the L5-S1 level and severe facet degenerative changes at the L4-5 level with marked articular diastasis." Doc. 8-1 at 23 (citing *id.* at 499-500). After weighing the evidence, however, the ALJ noted that Plaintiff "did not require intensive treatments until after her November 2019 lumbar spine surgery [with Dr. Bruck]." Doc. 8-1 at 23 (citing Doc. 8-2 at 11). Again, the ALJ also considered and found persuasive the vocational assessments of the state agency medical consultants in establishing Plaintiff's EOD—which assessments specifically took into account many of Dr. Bruck's test results. Doc. 8-1 at 25 (citing *id.* at 90-101; 102-114).

As it must, the Court declines Plaintiff's invitations to re-weigh the evidence, as it is within the purview of the ALJ's job to weigh the evidence and choose what evidence to credit. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Thus, Plaintiff's second argument also fails.

**III. CONCLUSION**

For the foregoing reasons, Plaintiff's *Motion for Summary Judgment* should be **DENIED**, Defendant's *Motion for Summary Judgment* should be **GRANTED**, and the decision of the Commissioner should be **AFFIRMED**.

**SO RECOMMENDED** on September 7, 2023.

RENEE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of this report and recommendation will be served on all parties in the manner provided by law.  Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b).  An objection must identify the finding or recommendation to which objection is made, the basis for the objection, and the place in the magistrate judge's report and recommendation the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996), *modified by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections to 14 days).